```
 1                    UNITED STATES DISTRICT COURT

 2             WESTERN DISTRICT OF WASHINGTON AT TACOMA

 3   _____

 4   BRAD ERHART,                     )
                                      )
 5                   Plaintiff,       )
     v.                               ) 3:23-cv-05882-TMC
 6                                    )
     TRINET HR XI INC.,               ) Tacoma, Washington
 7   SWITCHBOARD TECHNOLOGY LABS      )
     INC, HARTFORD LIFE AND           ) February 8, 2024
 8   ACCIDENT INSURANCE COMPANY       )
     INC,                             ) Motion Hearing
 9                                    )
                     Defendants.      ) 1:30 p.m.
10
11   _____

12               VERBATIM REPORT OF PROCEEDINGS
           BEFORE THE HONORABLE TIFFANY M. CARTWRIGHT
13               UNITED STATES DISTRICT JUDGE
     _____

14   APPEARANCES:

15     For the Plaintiff:      BRAD ERHART
                               300 Southeast 184th Avenue
16                             Apartment 101
                               Vancouver, Washington
17
       For the Defendant      JEREMY F. WOOD
18     Trinet HR Xi:          Fisher & Phillips LLP
                              1700 Seventh Avenue
19                            Suite 2200
                              Seattle, Washington
20
       For the Defendant      EVA SHARF OLIVER
21     Switchboard:           Summit Law Group
                              315 Fifth Avenue South
22                            Suite 1000
                              Seattle, Washington
23
       For the Defendant      SARAH E. SWALE
24     Hartford:              Jensen Morse Baker PLLC
                              520 Pike Street
25                            Suite 2375
                              Seattle, Washington
```

1          AFTERNOON SESSION

2          FEBRUARY 8, 2024

3          THE CLERK:  We are ready to go on the record.  This

4     is Erhart versus TriNet HR Xi Inc., et al., CV23-5882-TMC.

5          Plaintiff Erhart, please make an appearance for the

6     record.

7               MR. ERHART:  This is Pro Se Plaintiff Brad Erhart.

8               THE CLERK: For Defendant TriNet.

9               MR. WOOD:  Jeremy Wood for TriNet.

10              THE CLERK:  Defendant Switchboard.

11              MS. OLIVER:  Eva Oliver for Switchboard.

12              THE CLERK:  For Defendant Hartford.

13              MS. SWALE:  Sarah Swale for Hartford.

14              THE COURT:  Thank you, everyone.

15     Especially for Mr. Erhart's benefit, I am going to give an

16     overview of how this will work.  Because this is

17     Switchboard's motion, they will speak first and counsel for

18     Switchboard will have the opportunity to present argument and

19     to answer any questions that I put to her, then, Mr. Erhart,

20     I will give you a chance to address me and my questions.

21     Then at the end, it will go back to counsel for Switchboard

22     for their rebuttal. That is how we will proceed.

23          Ms. Oliver, we will start with you.

24              MS. OLIVER:  Thank you, Your Honor.  Good afternoon.

25     Eva Oliver for Defendant Switchboard Technology Labs.

1      Your Honor asked the parties to address *Burnett vs*

2  *Pagliacci Pizza*.  *Burnett* is applicable although

3  distinguishable.  The facts were very important in *Burnett*.

4  Before I get into how and why *Burnett* applies but doesn't

5  change the outcome here, I would like to provide briefly some

6  context about the parties and the agreement at issue in this

7  case.

8      Mr. Erhart came to Switchboard with over 20 years of

9  professional experience in software development and

10  operations.  Switchboard hired Mr. Erhart in a high-level

11  position with a title Senior DevOps Engineer, which came with

12  a salary, equity and other terms, including a severance

13  provision that was carefully negotiated by Mr. Erhart.

14  Mr. Erhart signed the offer letter on August 23, 2021 after

15  several days of negotiating with Switchboard's CEO.

16      That signed agreement clearly and unambiguously

17  incorporated a document called the TriNet Terms and

18  Conditions Agreement, or TCA.

19      TriNet is a national full-service human resources provider

20  that Switchboard engaged to outsource human resources

21  functions like payroll benefits and the at-issue dispute

22  resolution policy, and --

23      THE COURT:  So, Ms. Oliver, I would like to talk a

24  little bit about the offer letter.

25      Just looking at the offer letter itself, nothing in the

1  offer letter mentions arbitration; is that correct?

2          MS. OLIVER:  That's correct.

3          THE COURT:  The offer letter itself did not attach to

4  TCA as one of the enclosures sent with it in either the first

5  offer letter that was sent to Mr. Erhart or the second offer

6  letter; is that correct?

7          MS. OLIVER:  That is correct.  The CEO of Switchboard

8  sent Mr. Erhart the offer letter via -- TCA via email four

9  days before the final offer letter.

10          THE COURT:  Putting aside the email for a moment,

11  which we will talk about, but putting aside the email from

12  the CEO, just looking at the offer letters and the

13  attachments, is that in any way distinguishable from *Burnett*?

14          MS. OLIVER:  It is, Your Honor.  In *Burnett* the

15  employee did not have an opportunity to review the

16  incorporated employee handbook that included the arbitration

17  provision.  Because there was no time to review that

18  document, the court looked to the face of the signed document

19  itself to see whether it previewed, that having no

20  opportunity to review the incorporated document, that there

21  was an arbitration agreement.  It was really because of the

22  timing that that fact was important in *Burnett*.  It is also

23  important for the purposes of procedural unconscionability.

24      As for mutual assent, there is no rule that a document has

25  to call out an arbitration provision in an incorporated

1  document for there to be mutual assent.

2  THE COURT:  Well, let's look at the language in

3  *Burnett*.  *Burnett* speaks a lot about the opportunity to

4  review it, but also about the notice of it.  It seems to me a

5  significant part of *Burnett* is that he was not given notice

6  that the document that was incorporated by reference included

7  an arbitration provision.  That, to me, seems exactly like

8  the circumstances here.  There is nothing in the offer letter

9  that would put Mr. Erhart on notice that the document that is

10 being incorporated includes an arbitration clause.

11 MS. OLIVER:  I have two answers to that, Your Honor.

12 First, I would argue that a fair reading of *Burnett* is that

13 the reason the notice issue mattered is precisely because

14 there was no time to review the incorporated documents.

15 Another way that there might have been assent is if in the

16 document signed it called out that there was an arbitration

17 agreement between the parties.

18 I do not think *Burnett* can fairly be read as requiring --

19 even where it is a sophisticated person like Mr. Erhart has

20 four days to review a terms and condition agreement that

21 includes an arbitration provision --

22 THE COURT:  I did ask you for the first series of

23 questions to put aside the separate email that attached the

24 TCA.  I want to talk first about the offer letter, and then I

25 want to talk about the circumstances of the other email.

1    If it hadn't been for the separate email, then why would

2    this arbitration clause be enforceable?

3         MS. OLIVER:  Is Your Honor's question if he had never

4    received the TCA at all?

5         THE COURT:  Yes.  I am asking you -- I am asking you

6    to start with the hypothetical, so you can either take the

7    first offer letter or you can take the second offer letter,

8    because as I understand the record, neither offer letter says

9    anything about arbitration and neither offer letter included

10   the TCA as an attachment.  Instead, it informed the employee

11   that they would get a copy of the TCA later after they began

12   employment.  Is that a fair characterization of the record?

13        MS. OLIVER:  Respectfully, that is a characterization

14   of the offer letter but not the record because, in fact,

15   Mr. Erhart did receive the TCA and did in actuality have an

16   opportunity to review it before signing the offer letter that

17   incorporated its terms.

18    Your Honor, normal principles of contract

19   interpretation --

20        THE COURT:  I do want -- I do want you to answer the

21   hypothetical question, which is that just because this --

22   because I want to focus first on the offer letter, and then

23   talk about the separate email because the offer letter was --

24   but for Mr. Erhart separately reaching out about a different

25   question, the offer letter is the only step that your client

1   took to inform him of any of this.  I want you to address

2   that question first because I don't see any way that the

3   offer letter is distinguishable from *Burnett*, apart from the

4   argument about the separate email.

5        I understand that argument.  I would like to first see if

6   you have any other arguments, putting that aside, for why the

7   offer letter alone would still be distinguishable.

8             MS. OLIVER:  On its face, the offer letter is similar

9   to what was presented in *Burnett*.  When you are asking a

10  question of whether there is mutual assent, you look at the

11  outward manifestations of the parties and circumstances

12  around the transaction.

13       Your Honor is correct, I am not arguing here that there is

14  something about the language in the offer letter that is, I

15  guess, outcome determinative here.  It really is that we must

16  look at the entire transaction and what actually happened,

17  the parties and the fact that Mr. Erhart did, in fact, have a

18  reasonable opportunity to review the Terms and Conditions

19  Agreement.

20       I want to make sure -- I am trying to answer your

21  question, Your Honor.  I want to be sure I am doing that.  Is

22  that answering your question?

23            THE COURT:  I think so.  Do you agree that if

24  Mr. Erhart had just signed the initial offer letter without

25  any follow-up or exchange with the company that the

1    arbitration agreement would be unenforceable?

2          MS. OLIVER:  Certainly we would have a situation that

3    would look a lot more similar to *Burnett*.  I think there

4    would still be a question about opportunity to review and

5    understand the terms given Mr. Erhart's sophistication, his

6    apparent ability to ask questions and ask for the Terms and

7    Conditions Agreement that is incorporated by reference.  It

8    would be a closer case.  That is not what we have here.

9    Your Honor is correct, that would look more similar to

10   *Burnett* than the situation at hand.

11         THE COURT:  I would also be curious to know why there

12   is no discussion of *Burnett* in either of your briefs.

13         MS. OLIVER:  I did not feel we were compelled to

14   include *Burnett* just on the fact -- factually it is not on

15   point at all.  *Burnett* involves cases where there is no

16   opportunity to review the agreement.

17       The other reason -- and I think *Burnett* fairly read is on

18   point.  *Burnett* was not a Federal Arbitration Act case.

19       I do want to make this point because the Federal

20   Arbitration Act -- if *Burnett* could be read as requiring a

21   special rule for arbitration clauses in employment agreements

22   under state law, that would be preempted by the Federal

23   Arbitration Act.  In that sense, I guess that is our

24   reasoning, Your Honor, for not including it in the briefing.

25   It is helpful as read by us, frankly, as an interpretation of

1    an extreme case where there is not mutual assent because

2    there was absolutely no opportunity to understand the terms

3    of the agreement.

4         It is not on all fours with the facts that we have.

5              THE COURT:  Well, okay.  I mean, I will say that this

6    is a quote from page 5 of your motion which says:  "In

7    determining whether the parties agree to arbitrate, courts

8    apply ordinary state law contract principles."  You then

9    proceed in your brief to go on and cite a number of -- you

10   rely on Washington State law, which in the sentence I just

11   read you seem to concede applies to contract formation, and

12   then you go on to cite a number of Washington cases that come

13   before *Burnett*.

14        The entire time I was reading your motions, I was asking

15   myself, when are they going to talk about *Burnett*?  It was

16   never there.

17        Then when I read Mr. Erhart's response, though he is

18   pro se and cannot be expected to have the same grasp of the

19   relevant case law, he essentially articulates the factual

20   argument that forms the basis of *Burnett*.  So I thought

21   surely they will address it in their reply brief, and it was

22   not there.

23        I don't get frustrated with counsel very easily.  I like

24   to let lawyers be lawyers and be adversarial.

25        I think it approaches a serious candor to the tribunal

1    problem, and I do not want it to happen again.

2      I think *Burnett* is the closest binding authority that is

3    on point.  I understand your argument that it is

4    distinguishable.  That does not mean it should be -- that

5    does not mean it shouldn't be talked about.  It means it

6    should be distinguished.

7      I would just caution you going forward, especially in a

8    situation where there is a pro se litigant, we are going to

9    be exceptionally diligent to make sure we are aware of all

10   relevant case law, and we expect all the parties to brief all

11   the relevant case law.

12        MS. OLIVER:  I understand.  I am happy you have given

13   us this opportunity to address *Burnett*.

14      It was absolutely not intentionally trying to hide

15   relevant authority from the Court.  It is regrettable that

16   you have that interpretation of what happened.  I can address

17   that directly and say it isn't what happened.  It is so

18   beyond not applicable on the facts, and it also not being an

19   FAA case, that is in footnote 2 of *Burnett*.  That is all I

20   have on that, Your Honor.

21      If I may continue to address the merits of why *Burnett*

22   does not apply here, I think it would be --

23        THE COURT:  Can you explain to me the FAA argument a

24   little bit more because I am looking at footnote 2 of *Burnett*

25   and it says, "The same would be true if the Federal

1 | Arbitration Act were applicable."

2 |     MS. OLIVER:  Right.  Meaning the Federal Arbitration

3 | Act was not applicable in *Burnett*.

4 |    The Federal Arbitration Act -- to the extent *Burnett* could

5 | be interpreted as creating some kind of special unique rules

6 | for arbitration clauses in employment agreements, normally

7 | under Washington law when you incorporate a document by

8 | reference, there is no requirement that the incorporating

9 | document include a preview of terms of the incorporated

10 | document.

11 |    If you would read *Burnett* to require that in a

12 | circumstance where there was reasonable notice -- again, I

13 | believe that is not how one should read *Burnett*.  *Burnett*

14 | provides, quote, "arbitration agreements stand on equal

15 | footing with other contracts."  I do think we should take

16 | that seriously.

17 |    If *Burnett* was read as treating arbitration agreements and

18 | employment contracts differently than other types of

19 | provisions, it would be preempted by the FAA.  The FAA

20 | requires Congress to treat arbitration agreements just as it

21 | would any other contract.  The United States Supreme Court is

22 | very clear on this point in *AT&T Mobility vs Concepcion*, that

23 | is 563 U.S. 333.  The Court wrote -- regarding the final

24 | phrase of section 2 of the FAA which permits arbitration

25 | agreements to be declared unenforceable upon such grounds as

exist in law or in equity for the revocation of any contract,
the court wrote:  "This saving clause permits agreements to
arbitrate to be invalidated by generally-applicable contract
defenses such as fraud, duress, or unconscionability, but not
by defenses that apply only to arbitration or that derive
their meaning from the fact that an agreement to arbitrate is
at issue."

Respectfully, I think *Burnett* should be read as hinging on
the fact that the pizza delivery driver who showed up to a
40-minute to an hour orientation and had no opportunity to
read the attached handbook that was incorporated by
reference, that was critical in *Burnett*.  I don't think
*Burnett* can be read as requiring circumstances where if a
person has four days with an agreement that is clearly and
unambiguously incorporated by reference into the agreement
they signed, I do not think *Burnett* can fairly be read as
requiring the signed agreement to provide special notice that
there is an arbitration provision in the incorporated
document, at least under the FAA.  Also just the facts in the
agreement.

I would like to return to that because the facts of
*Burnett* are fairly extreme.  Even Burnett, the pizza delivery
driver, he showed up for a 40-minute to an hour training and
was asked to sign an employment agreement to begin work.  He
was given the employee handbook, which was called "A Little

Book of Answers," but was expected to read it after signing the agreement on his own time.  And even if Burnett had been able to skim that handbook during the orientation, he wouldn't have been able to find the arbitration agreement because it wasn't included in the table of contents and it was buried on page 18 under the fairly meaningless heading "mutual fairness benefits."

It was considering all of those facts that the court found there was no assent.  He couldn't have known he was agreeing to arbitrate, and also the entire agreement was procedurally unconscionable.

This is not a case where Burnett had no way of knowing he was agreeing to arbitrate claims.  He had four days to review the TCA, like I mentioned.

To highlight some evidence in the record on this point, in Mr. Erhart's declaration he attached Exhibit B, an August 14th email, where he actually raised concerns about Switchboard's relationship with TriNet after receiving the initial version of the offer, which, like the final, incorporated the TCA.

Mr. Erhart complained that he didn't have insight into the contractual agreements between Switchboard and TriNet and therefore couldn't adequately evaluate the terms.  He acknowledged that Switchboard was deprived of his employer, but shared he believed it was ill advised.

1     In response on August 17, this is Docket 22, Exhibit C,

2  Switchboard's CEO Chris Hermida invited Mr. Erhart to discuss

3  his concerns over the phone.  Mr. Hermida says, "Hey, Brad,

4  it might be easiest to just hop on a call and walk through

5  each of your concerns."  Mr. Hermida and Mr. Erhart did speak

6  on August 17th.  By Mr. Erhart's account, he asked for at

7  least the TriNet Switchboard agreement.  After this call,

8  Mr. Erhart received the TCA attached to the August 19th email

9  that we have discussed.  That email reads, in part, "As

10  requested, I have attached copies of Trinet's terms."

11     A few days later, Mr. Erhart signed the updated final

12  offer letter, which incorporates the TCA very clearly,

13  providing this offer letter, together with the TCA, forms the

14  parties' agreement.

15     Mr. Erhart cannot dispute here, this is unlike the pizza

16  delivery driver in *Burnett*, that he had an opportunity to

17  review the agreement containing the arbitration provision.

18  Not only that, Mr. Erhart isn't a blue-color employee.  He is

19  a professional software engineer with over 20 years of

20  professional experience and held a senior position.  He

21  exhibited leverage and bargaining power in the negotiations.

22  He had an opportunity to negotiate things, not just like the

23  start date, but substantive terms of the offer.  He received

24  concessions from Switchboard.  For example, Mr. Erhart

25  requested that the offer -- the final offer letter include a

1  severance clause that wasn't in the initial offer letter

2  using his own description of his reasoning for making that

3  request.  Mr. Erhart cited the broad nature of the parties'

4  non-disclosure agreement.  This is in his response, Docket

5  21, F5.  Mr. Erhart was carefully reviewing documents and

6  negotiating the substance of the parties' agreement.

7      Mr. Erhart has suggested he didn't read the TCA, which I

8  believe it is hard to imagine given the contemporaneous

9  document. Even if true, what matters under *Burnett* is not

10  whether he read the agreement but whether he could have,

11  whether he had the reasonable opportunity to read the

12  agreement.

13      The record is clear, Mr. Erhart agrees he did have a

14  reasonable opportunity to read the agreement.

15      The second point I wanted to make today is the TCA itself

16  has none of the concerning characteristics of the Little Book

17  of Answers in *Burnett*.  The terms and conditions agreement,

18  this is Docket 18, Exhibit C, it is not an employee handbook.

19  By its title alone, it signals it is an agreement containing

20  binding terms.  It also begins in all caps with the warning:

21  Read this TCA carefully because it contains important

22  information regarding the handling of any dispute arising out

23  of your relationship with TriNet, your company, and related

24  matters.  Also, on page 1, the TCA includes a table of

25  contents that is underlined and in bold.  Section 8 reads:

1   "Dispute resolution protocol" -- I am quoting now -- "and

2   mandatory arbitration of claims."  Section 8 also has

3   subsections A through F listed also on the first page on the

4   table of contents.  Those include starting arbitration, how

5   arbitration proceedings are conducted.

6       My point is a reasonable person would know from a cursory

7   review of just the first page of the TCA that they were

8   agreeing to arbitrate.

9       To be clear, and I have made this point already,

10  Your Honor, I just want to be clear that because Mr. Erhart

11  had a reasonable opportunity to read and understand the TCA,

12  at least on the issue of mutual assent, it doesn't matter

13  that the TCA's arbitration clause is conspicuously previewed

14  on page 1, parties are responsible for reading and

15  understanding the terms of agreements they enter, conspicuous

16  or not.

17      I do think that is fairly interpreted in *Burnett*.  In

18  *Burnett*, the reason it mattered on the issue of mutual assent

19  was because that was the only way the employee was going to

20  possibly know he was agreeing to arbitrate claims under the

21  circumstances.  It also matters for procedural

22  unconscionability.

23      That's just not the case here.  The TCA provides just

24  another example of how this case differs so drastically from

25  the circumstances that were present in *Burnett*.

1    I do want to turn to procedural unconscionability.

2        THE COURT:  I don't need you to address that.

3    I would like you to address the *Nelson* case from the Ninth

4    Circuit that is relied on extensively in *Burnett* for the

5    proposition that "the waiver of the judicial forum by an

6    arbitration provision must be explicitly presented to the

7    employee, and the employee must explicitly agree to waive the

8    specific right in question."

9    That, to me, is the most relevant part of *Burnett* for this

10   case with respect to your argument about, well, he had the

11   opportunity to read the TCA because, yes, he was sent the TCA

12   in a separate email that was in response to a different

13   question that he asked.

14   He asked Mr. Hermida for a copy of the PEO agreement

15   between TriNet and Switchboard, which your client refused to

16   provide and instead provided him two other attachments.

17   There is still nothing in any of those communications that

18   says, hey, by the way, you should read this really carefully.

19   This is the attachment that is referenced in your letter or,

20   you know, this contains our dispute resolution policy.  You

21   need to read it.

22   There is absolutely nothing that either flags there is an

23   arbitration clause in this document or even expressly

24   connects this document to it being what is incorporated by

25   reference.

1    I know you have an argument based on the file name of the

2    PDF that he should have put those things together.  I have a

3    hard time reconciling that with the language from *Burnett*

4    that talks about the arbitration provision being explicitly

5    provided to the employee.

6         MS. OLIVER:  Respectfully, I just want to clarify a

7    characterization that Switchboard refused to provide the PEO

8    agreement.  I think the record reflects Switchboard was in

9    the process of doing that and it didn't happen.  Not any sort

10   of reason why that happened.

11        THE COURT:  I thought he said in his email that I

12   can't provide that to you, or something to that effect.

13        MS. OLIVER:  Understood.

14   I will address *Nelson*.  In *Nelson*, at issue was, first of

15   all, ADA claims, which, to be clear, Mr. Erhart has contract

16   and tort law claims against my client.  There are ADA claims

17   in the case, but not against Switchboard.

18   *Nelson* involved a receipt of -- an acknowledgement receipt

19   of an employee handbook during the course of employment that

20   was updated during the course of employment.  The employee

21   acknowledged receipt and continued employment.

22        Under those circumstances, the Ninth Circuit -- this was

23   in, I think, the late '90s -- decided that there was no clear

24   waiver of a right to a federal forum for an ADA case.  That

25   is not on all fours here.  Quite frankly, I don't know how

you can require here these sort of previews or special notice
requirements for the arbitration provision without running
into a Federal Arbitration Act policy or problem --
preemption problem.  The Federal Arbitration Act is --
requires we look at arbitration agreements just like we would
any other contract.  I am just not aware in Washington law of
any generally applicable contract principle that for a
document to be incorporated by reference specific provisions
have to be called out or discussed in writing between the
parties during the course of negotiations.  I respectfully
disagree with that reading of *Burnett*, and that reading of
the requirements here.

THE COURT:  The last thing I would like you to
address is with respect to his claims for breach of the
severance agreement.  I don't really see that as a scope of
arbitrability question.  I really view that as an entirely
separate contract where we are looking at that contract to
see if it is in any way governed by arbitration.

I understand your argument with respect to whether the
scope has been delegated to the arbitrator by inclusion of
the JAMS rule.  I am having a really difficult time
understanding how that could apply to the breach of the
severance agreement when the express language of the
severance agreement says it supersedes any and all prior
agreements and understandings between you and the company

1    concerning the subject matter of this agreement.

2        The subject matter of the severance agreement is the

3    severance agreement, and that is what he has alleged was

4    breached.

5        I have a really hard time understanding how there is any

6    way that the earlier arbitration clause, even assuming it was

7    valid, would still apply to a breach of contract provision

8    for the separate contract with this kind of integration

9    clause.

10        MS. OLIVER:  I would like to address your delegation

11    question first.  I heard two questions here. One is on the

12    issue of who decides this, the other is the merits.

13        On delegation, and we cited these cases in our briefing,

14    the scope of this Court's review is very limited on a motion

15    to compel arbitration to whether there exists agreement to

16    arbitrate.  The effect of a separate agreement on that

17    initial agreement is delegated to the arbitrator.  At least

18    in the example I found, there are examples of courts finding

19    this.  I cited a case, *Jonathan vs Oracle*, this was in the

20    Northern District of California, affirmed by the Ninth

21    Circuit, holding a dispute about whether an arbitration

22    agreement was superseded by later agreement should be decided

23    by an arbitrator because the parties' unincorporated JAMS

24    rules just as they did here.

25        What it comes down to, Your Honor, is that the Court's

1    inquiry here is a limited gatekeeping function looking for

2    the existence of an agreement to arbitrate.  It doesn't reach

3    the validity of that agreement.  It actually, as we argued in

4    the briefing, doesn't reach issues of unconscionability

5    unless it has been attacked specifically as to the

6    arbitration provision.  And similarly, the effect of a

7    separate document on that agreement is an issue that is

8    delegated to the arbitrator.

9            THE COURT:  I guess what I am having a harder time

10   trying to figure out how to determine is -- so assuming I

11   agree with you about the JAMS rule delegating scope to the

12   arbitrator, I still don't know that this separate contract

13   claim, based on a separate contract, has anything to do with

14   the scope of the agreement to arbitrate.  It just seems to me

15   like it is a totally new claim based on a totally new

16   contract that arose after his employment was over.

17       Your argument makes it sound like even if he had a claim

18   that came up five years later under a totally separate

19   contract, that as long as your client asserts, oh, well, this

20   is part of the scope, then I have to say, well, that's not

21   part of what I review here.

22       What guides that determination?

23            MS. OLIVER:  I would look to, Your Honor -- let me,

24   if I may, have just a moment. *Henry Schein vs Archer & White*

25   *Sales Inc.*, a Ninth Circuit case and Supreme Court case.  It

1    is a limited gatekeeper function looking for existence of an

2    arbitration agreement.  The scope is similar, I guess, to

3    your -- I see the question you are asking about what falls

4    within issues of scope and other types of issues about

5    enforceability.  It is not just the scope that is delegated

6    necessarily by incorporation of the JAMS rules.  It is also

7    the validity of the agreement, whether the agreement is

8    unconscionable as a whole and the effect of other agreements.

9        Respectfully, it is broader.  The issues that are

10   delegated by virtue of incorporating the JAMS rules are

11   broader than is this claim listed among those in the

12   arbitration provision.

13       On the merits of the separation list, the scope of the

14   separation agreement is the termination.  It does not

15   supersede -- fairly read, the agreement supersedes other

16   agreements as to that subject matter that would include

17   certain provisions that are listed in the separation

18   agreement.  It wouldn't overhaul or supersede the general

19   dispute resolution process that, by its own language,

20   survived termination of the agreement.

21           THE COURT:  It survives termination, but that makes

22   sense to me with respect to claims that are covered, claims

23   that arose during employment, claims that would be covered by

24   the arbitration provision.  Where it doesn't make sense to me

25   is a claim that arises entirely after his employment is ended

and after he signed a severance agreement that creates just a
totally new contractual obligation that is not related to his
original -- it is not arising from his original -- it is a
new contract.  Seems to me like for a breach of contract
claim, you look at that contract and what the parties agreed
to in that contract.  You would be looking at is there
anything in this contract that shows an intent to arbitrate.
That is the difficulty I am having with respect to the breach
of the severance agreement.

MS. OLIVER:  Understood, Your Honor.

I would say two things.  One, that does go just plainly to
the scope.  Your Honor might be adopting a narrower view of
the term "arising out of the employment."  Our position is
that everything basically that Mr. Erhart has alleged in the
complaint as with respect to Switchboard has arised out of or
relates to his employment with Switchboard, which is the
language of the dispute resolution policy that, again, by its
own terms survived termination.  That is a question properly
before the arbitrator as to whether there is some claim that
Mr. Erhart brings that did not fall within the scope of that
provision.  The separation agreement doesn't change that.
The separation agreement itself arises from the parties'
employment relationship.

THE COURT:  I have one last area that I wanted you to
address, which is in terms of stays versus dismissal for

1    claims that are subject to arbitration.  I understand the

2    Supreme Court recently granted cert on this issue.  Given

3    that, doesn't it make the most sense to stay any claims

4    against your client until the Supreme Court resolves whether

5    dismissal is even allowed?

6          MS. OLIVER:  Our position is this is just a

7    discretionary decision by you.  We have asked for dismissal

8    and think that is an appropriate choice.  Yeah.  Yes, it is

9    possible that if Your Honor wanted to stay the case and

10    arbitration, we certainly see merit to that.

11      I would like to address one more point on just the

12    separation agreement just to highlight.  Mr. Erhart has

13    claimed in this lawsuit that the separation agreement was

14    fraudulently entered and is now using the separation

15    agreement as a valid and binding agreement and suggesting it

16    supersedes the parties' agreement to arbitrate.  We agree it

17    is valid and binding.  We have a different reading of the

18    superseding clause.  I did want to highlight just that as it

19    might have an impact on this case.

20          THE COURT:  Mr. Erhart, I would like to hear from

21    you.

22          MR. ERHART:  Thank you, Your Honor.  May it please

23    the Court.

24      First, I would like to apologize about not including more

25    case law in my oppositional brief.  Being pro se, this is a

1   new process for me, so I spent a lot of time trying to get

2   what I did done.  Unfortunately, I didn't have the

3   opportunity to really understand the need or what case law

4   would be applicable or how to adequately reference that.

5       I do have a better understanding now.  I would like to

6   respond to several things that were discussed.

7       First, there is some accusation I agreed to certain

8   things.  I want to make it clear that is not the case.  I

9   know we are here primarily to discuss *Burnett*.  I would like

10  to really point out that no two cases are ever going to be

11  exactly the same.  There is different circumstances in every

12  case.  Really, when you look at *Burnett*, it really touches at

13  the heart of what qualifies for, if something is considered

14  to be assented to.  They discuss several cases in there that

15  I really think touches on the heart of the topic.

16      I would like to point out, I know that one of the most

17  important factors you are considering is the separate email

18  sent by Switchboard.  There was no notice or any like -- I

19  know they claim that the outward expression is what matters

20  the most.  There is no outward expression that they intend to

21  arbitrate.  They never mention it in the offer letter.  They

22  never mention it in the separate email that was sent.  The

23  separate email that was sent was a completely different

24  topic.  It was in regard to the PEO contract.

25      I did, you know, spend some time after interviewing for

1   approximately a month, which was a long time.  It is a long

2   time to commit to a company that you are not getting anything

3   from at the time.  Based on the employment non-disclosure

4   agreement they attached alongside the initial offer letter, I

5   would like them to include a severance clause, because it was

6   rather broad and I read it because it was attached and cited.

7   It specifically mentioned the offer letter, requested it be

8   signed, unlike the TCA that they alleged be -- the TriNet

9   Terms and Conditions Agreement.  The email sent by

10  Switchboard never even referenced the document as the TCA.

11  They -- Mr. Hermida -- Mr. Hermida only stated it was the

12  TriNet terms, which I had no reason to believe that it had

13  any relevancy to my agreement with Switchboard.

14      Later in the offer letter, they use an acronym for the

15  document which I know that they want to make it seem like,

16  you know, after four days of maybe even glancing at a

17  document I would remember everything in it.  I work in

18  technology, so I have to process a lot of information.

19  Sometimes I have to forget the things that don't seem

20  relevant.  It didn't seem relevant.  It had TriNet's name on

21  it.  It was a document that -- their argument is that because

22  I received it, well, they also sent the employee handbook

23  they claim is the Switchboard employee handbook, which is

24  actually the TriNet employee handbook.

25      Everything in the employee handbook, if they want to

1   allege I had an opportunity to read the documents they sent

2   me, only state that it would be later agreed to through

3   TriNet's platform where they would send an email that would

4   indicate I had accepted the agreement.

5      There is nothing in there that would indicate by signing

6   the offer letter that I would be agreeing to any type of

7   arbitration.  The only thing they claim is it would be -- the

8   TriNet terms agreement would be something that would be later

9   provided through TriNet's platform.

10      There is nothing in there from an outward expression that

11   shows that there is an agreement to arbitrate.

12      I think that is directly relevant in *Barnett* (sic) because

13   even in *Barnett* they specifically state that incorporation by

14   reference does not even in itself establish mutual assent.

15   Even if it was determined that the TriNet terms and

16   conditions agreement was adequately incorporated, which I

17   disagree with, it doesn't establish assent.  There is nothing

18   in the documents that they provided.

19      I have clearly provided the evidence to show that there is

20   nothing to show that I had assent to that. The documents they

21   attached, it clearly had a check box for -- to opt out of the

22   class action waiver which, based on their argument of

23   incorporation, they are stating they didn't even provide me

24   with the option for doing that.

25      Even reading the TCA itself, it has its own separate

1    acknowledgement requirement.  It seems very difficult to

2    incorporate another document that is asking the document

3    itself to be signed.  Seems like in that case, that even

4    based on their alleged incorporation, in that case reading

5    the document, stating it needs to be signed, even if they

6    incorporate it, they incorporate the rules of signing the

7    actual separate document.  They don't state any section they

8    were incorporating, which I think would be necessary to

9    incorporate the document that has its own explicit signing

10   requirement.

11       If they want to incorporate specifically what they are

12   claiming is the TriNet terms, they would need to make

13   reference to that itself and claim that it is being

14   incorporated or integrated.  Otherwise, just based on their

15   claimed incorporation, seems like it would incorporate the

16   full document, which doesn't even apply to Switchboard.  They

17   could be a potential beneficiary to the document.  The

18   document itself doesn't apply to Switchboard.  It is a TriNet

19   copyright document, has TriNet copyright on the document

20   itself.  Specifically mentions TriNet throughout the

21   document.  It has no reference to Switchboard in the document

22   whatsoever.  We are going off the assumption that Switchboard

23   has signed a customer agreement with TriNet.

24       TriNet responded in this case already that they were not

25   my employer, which in the TCA itself explains that a customer

1  that would be a beneficiary to the agreement would have

2  entered into an agreement where TriNet would be a

3  co-employer.  I don't understand how somebody can be a

4  co-employer but not an employer.  It doesn't make any sense.

5      I would like to also mention in *Barnett*, the important

6  thing, I think, that was discussed is that he still had no

7  knowledge of the arbitration provision terms when he signed

8  the document.

9      I had no reason to really familiarize myself with the TCA

10 at the time.  I requested the severance agreement clause,

11 which was important to me.  The other documents for TriNet,

12 after speaking with Mr. Hermida, which he was very reassuring

13 that everything was fine and he included that, it seemed like

14 both of those documents, even based on their description, is

15 something that is provided after signing the employment offer

16 letter and starting your employment.

17     The e-mail sent by TriNet on August 31st explains that

18 they are providing the documents at that time.  I don't think

19 they were ever sent.  I don't think it is even part of

20 TriNet's normal process or part of what they claim is an

21 employer normal process to provide the documents to its

22 employee.  It was only done in this case in regards to my

23 prior inquiry regarding the PEO contract.

24     It is completely outside the norm.  They didn't provide

25 any notice of them intending to incorporate the document.

1  They didn't provide any notice of including an arbitration

2  agreement that would apply to Switchboard.

3      I would also like to point out in my brief, I do make some

4  other arguments that I do feel are still relevant here.  I

5  know that Switchboard argued -- continues to argue they

6  believe that the arbitrator has delegation for the matters.

7      I would like to point out I did directly, you know,

8  question and in my brief claim that even the delegation would

9  have been fraudulently induced.  I believe (inaudible) is

10  clear in the Ninth Circuit -- I can't reference the specific

11  cases to you at the moment.  I would have to try to pull up

12  another tab.  I have read it recently.  I am confident the

13  Ninth Circuit has determined that as long as you adequately

14  specifically question the delegation provision as part of

15  your argument, as I have done here, that the arbitrator does

16  not have delegation.  It is ultimately in your hands at that

17  point to make those determinations.

18      I don't believe that their argument that the arbitrator

19  has delegation at this point would even be accurate.  I

20  clearly disagree there is even an agreement to arbitrate

21  here.

22      The severance agreement itself, I know that -- I like the

23  point that was made in regards to -- what they are arguing

24  here is these are claims that occurred after, after

25  termination, after employment.  They are claiming that there

1   is still an arbitration provision.  Actually, what they are

2   claiming is there probably isn't, but it is still up to the

3   arbitrator to decide everything forever in eternity.  That

4   doesn't make sense to me.  Five years from now I could get

5   assaulted by a Switchboard employee and they could claim they

6   still have arbitration pertaining to my employment.  There is

7   no bounds to this, what they are claiming is this ongoing

8   arbitration clause.  You know, I don't foresee how that, you

9   know -- I believe, you know, there would need to be some kind

10  of restriction as to matters that occur after employment.

11       Clearly this is something that --  I do allege that the

12  claims against Switchboard -- you know, I may amend my

13  complaint at some point, but I do allege that they are

14  related to my termination.  That doesn't mean that, you know,

15  the issues themselves are in regards to breach of contract,

16  which occurred after.

17       I guess, you know, they could claim the conspiracy claim

18  is related to my employment.  I don't see how they could

19  claim the breach of contracts would be.  I do also adequately

20  argue, I think it is important to note specifically the TCA

21  that they allege is incorporated, it doesn't even provide

22  delegation.  It mentions the JAMS rules.  This is like a

23  document in a document in a document that they are claiming

24  assigns arbitration to the arbitrator.

25       I think that is important in *Barnett* as well because that

1  is one of the issues, is how many levels deep can we go in

2  what they are claiming is references to other documents.

3  There is no delegation in the TCA itself.  It just says

4  "incorporates the JAMS rules."  Then what they are suggesting

5  is I have to go read the JAMS rules as well and fully

6  understand those, which is a very lengthy document.

7      From after initiating this case and looking at them, seems

8  like only delegation would be something later on and a very

9  longer page, even within the JAMS rules.  I think *Barnett*

10  really touches on that in regards to it being imbedded in the

11  document.  The same thing with the TCA.  Even the email that

12  they provided, you know, just a cursory glance, there is no

13  reason for me to really go down and read a bunch of the

14  terms, especially when it is not relevant to the offer letter

15  itself.

16      So I don't see -- I think there is a lot more relevancy to

17  *Barnett* here.  I don't think, in *Barnett*, that really what

18  was considered was just the -- whether they had an

19  opportunity to read it.  I think it was more based on whether

20  there was ever actual mutual assent.  The cases they have

21  evaluated in *Barnett* all touch on that specifically.  I don't

22  think it even matters whether it was provided before in

23  *Barnett*.  I don't think that is what the case is about.

24      They touch upon the procedural and substantive

25  unconsciousability  (sic).  The procedural unconsciousability

1   here would be that they never provided any notice that there

2   is an arbitration agreement.  I think that is directly

3   discussed in *Barnett*.  That's where they touch on the issue

4   of mutual assent and determine that there is procedural

5   unconsciousability.  And so I think that is one factor.  I

6   did make multiple arguments in my brief I also believe should

7   be relevant in that matter.

8        From my understanding, *Barnett*, even though it is not the

9   same type of case where I -- you know, I think in *Barnett* he

10  wasn't actually given the employee handbook until after he

11  started employment.  Well, in this case, there would have

12  been no notice of any arbitration agreement.  To my

13  knowledge, there never was until after starting employment as

14  well.

15       I don't see how they can argue that they are that much

16  different.  To me, they seem very much alike.

17            THE COURT:  All right.  Thank you, Mr. Erhart.

18       Do counsel for either of the other two parties wish to be

19  heard at all on this motion?

20            MR. WOOD:  Not today, Your Honor.

21            MS. SWALE:  No, Your Honor.  Thank you.

22            THE COURT:  Ms. Oliver.

23            MS. OLIVER:  Your Honor, of course, I will address

24  any other questions you have.

25       We spent a fair amount of time on the alternative

1  hypothetical world where Mr. Erhart never received the TCA.

2  That's not what happened.  We have to look at the

3  circumstances of the actual transaction.  Mr. Erhart received

4  the Terms and Conditions Agreement with several days to

5  review it.  He also -- admittedly, it was sent to him because

6  he asked about the relationship with Switchboard and TriNet.

7      This is not like *Burnett*.  *Burnett* was about timing

8  fundamentally on the issue of mutual assent.  *Burnett* was

9  about timing.  The employee had no opportunity to review and

10  understand the terms.

11      On Mr. Erhart's issues with whether the offer letter

12  incorporates by reference the TriNet document that was

13  signed, we addressed that in our briefing.

14      I want to briefly cover (inaudible) contract.  This has

15  been cited by the Washington Court of Appeals, for example,

16  in the *Seventh Day Adventist* case.  As long as the contract

17  makes clear reference to the document and describes in such

18  terms that its identity may be ascertained beyond doubt, the

19  party to a contract may incorporate contractual terms by

20  reference to a separate non-contemporaneous document

21  including a separate agreement to which they are not parties

22  and including a separate agreement that is unsigned.

23      There is no prohibition under Washington law.  In fact, it

24  is quite standard to incorporate agreements by reference.

25      Mr. Erhart received the TCA with plenty of time to review

1 it.  The record shows Mr. Erhart was carefully reviewing and

2 negotiating his offer.  He had opportunity to ask questions

3 about the agreement.

4   The Ninth Circuit in a recent -- this district in recent

5 decision -- this is from Judge Robart granting a motion to

6 compel arbitration in *Briggs vs* -- this was February 17th,

7 2023.  The plaintiff had clicked an "I agree" button in close

8 proximity to text that read:  "By selecting the 'I agree'

9 button, you acknowledge and agree to the mutual resolution

10 agreement."  That is all that it said.

11   Even though the text didn't use the word "arbitration," or

12 wasn't particularly clear that it was attaching an

13 arbitration provision, Judge Robart found the hyperlinked

14 document was an agreement to arbitrate.  Most importantly,

15 the plaintiff had time to review, wasn't given a clock, and

16 had time to review that hyperlinked document.

17   That is, as a practical matter, much more sort of obscure

18 than what happened in this case.

19   Let me check my notes to see if I had anything else.

20    THE COURT:  I am curious why there isn't that type --

21 if the document seemed to lay out that he was supposed to

22 have had to go through and review and click to accept it to

23 ever get a paycheck, I guess one other thing that stood out

24 to me while reviewing all this is why isn't there a signed

25 version of this agreement?

1     MS. OLIVER:  We don't know if there is or not,

2  respectfully.  Mr. Erhart would have clicked through the

3  agreement on TriNet's portal.  We just don't have that

4  information as to whether or not that happened in this case.

5     I will say the offer letter itself is unambiguous.  The

6  TCA, among other documents, forms the complete agreement.

7  Here, Mr. Erhart, being a sophisticated professional with 20

8  years of experience in negotiating a contract, being

9  concerned with TriNet's involvement in the contract, had an

10  opportunity to -- if he didn't know what the TCA was at the

11  time, he certainly had an opportunity to ask; in fact,

12  exhibited that he was asking about the parties' relationship.

13  The TCA was sent to him.

14     The only other thing I wanted to address from Mr. Erhart's

15  comments, this idea that -- and Your Honor raised a similar

16  concern as well -- this idea that if Mr. Erhart is assaulted

17  years down the line by a Switchboard employee, would that be

18  submitted to arbitration.

19     The question of the scope of the arbitration agreement

20  goes to the arbitrator.  It can ultimately be determined the

21  claim is not properly in arbitration and Mr. Erhart would get

22  a judicial forum.  It is not the be all, end all that the

23  Court grant a motion to compel arbitration.  I just wanted to

24  make that clear.

25     That is all I had, Your Honor, unless you have further

1    questions for Defendant Switchboard.

2              THE COURT:  I do not have further questions.

3         Thank you all for your arguments today.  We will take the

4    motion under consideration.

5              MS. OLIVER:  Thank you.

6              THE COURT:  Thank you, everyone.

7    (The proceedings adjourned.)

8

9

10                      C E R T I F I C A T E

11

12

13        I certify that the foregoing is a correct transcript from

14   the record of proceedings in the above-entitled matter.

15

16

17

18   */s/ Angela Nicolavo*

19   ANGELA NICOLAVO
     COURT REPORTER

20

21

22

23

24

25