UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| BRAD ERHART,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>TRINET HR XI INC; SWITCHBOARD TECHNOLOGY LABS INC; HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY INC.,<br><br>　　　　　　Defendants. | Case No. 3:23-cv-05882-TMC<br><br>ORDER DENYING DEFENDANT'S MOTION TO COMPEL ARBITRATION |

Before the Court is Defendant Switchboard Technology Labs Inc.'s motion to compel arbitration. Dkt. 17. Because Switchboard has not shown the existence of a valid agreement to arbitrate, the Court DENIES Switchboard's motion.

## I.　　PROCEDURAL HISTORY

Pro se Plaintiff Brad Erhart filed this case on September 29, 2023, against Defendants Switchboard, TriNet HR Xi Inc. ("TriNet"), and Hartford Life and Accident Insurance Company Inc. ("Hartford"). Dkt. 1. Mr. Erhart alleges, among other things, disability discrimination, wrongful termination, and breach of contract arising from his previous employment with

ORDER DENYING DEFENDANT'S MOTION TO COMPEL ARBITRATION - 1

Switchboard/TriNet and disability benefits he received from Hartford. *Id.* On December 1, 2023, Switchboard moved to compel arbitration of the claims against it based on an arbitration provision contained within the "TriNet Terms and Conditions Agreement" ("TCA"), a document Switchboard contends was incorporated by reference into Mr. Erhart's signed employment contract. Dkt. 17. Mr. Erhart responded by asserting that the TCA was not incorporated into his contract and any enforcement of arbitration would be unconscionable. Dkt. 21. Switchboard replied (Dkt. 25) and the Court heard oral argument (Dkt. 34). Neither TriNet nor Hartford joined in Switchboard's motion.

## II.   BACKGROUND

On August 13, 2021, Chris Hermida, the co-founder and CEO of Switchboard, emailed Mr. Erhart an offer of employment as a Senior DevOps Engineer. Dkt. 22 at 7. Hermida's email contained four attachments: an offer letter, a summary of Switchboard's health care plan, an employee benefits guidebook, and a nondisclosure and invention assignment agreement ("NDIAA"). *Id.* It did not contain a copy of the TCA. *See id.*

The next day, after Mr. Erhart received the offer, he reached out to his recruiter with questions—leading with his concern that it was unclear whether Switchboard or TriNet was to be his "employer of record" and that he needed more information about "any contractual arrangements between" the two entities. *Id*. at 9.

After Mr. Erhart's inquiries, Hermida emailed and spoke with Mr. Erhart to "walk through each of [his] concerns." *Id*. at 11. According to Mr. Erhart, during the call he asked about Switchboard's professional employer organization ("PEO") relationship with TriNet and asked for a copy of the PEO contract between the two companies. Dkt. 1 at 4. Following the call, on August 19, Hermida emailed Mr. Erhart stating Switchboard was "unable to provide a copy of [its] contract with TriNet." Dkt. 18 at 9. Instead, Hermida attached an "employee handbook" and

ORDER DENYING DEFENDANT'S MOTION TO COMPEL ARBITRATION - 2

a document he described only as "TriNet's terms." *Id*. Nothing in Hermida's email explained the relevance of "TriNet's terms" to Mr. Erhart's potential employment with Switchboard. Hermida stated that Switchboard would send a revised offer letter. *Id*.

Hermida emailed Mr. Erhart the new offer letter on August 23. Dkt. 22 at 18; Dkt. 18 at 5–7. Three sections of the offer letter are relevant to this motion.

First, in a section titled "Acknowledgment of Company Handbook and Confidentiality Agreement," the offer letter stated:

> As a **Switchboard Technology Labs, Inc.** employee, you are required to follow its rules and regulations. Therefore you will be asked to acknowledge in writing that you have read the **Switchboard Technology Labs, Inc.** employee handbook(s) **and sign and comply with the attached Employee Non-Disclosure and Invention Assignment Agreement (the "Proprietary Information Agreement"), which prohibits, among other things, the unauthorized use or disclosure of Switchboard Technology Labs, Inc.'s confidential and proprietary information**.

Dkt. 18 at 6 (emphasis in original). This section drew clear attention to the importance of the Proprietary Information Agreement and its role in employment with Switchboard. A copy of that agreement was attached to Hermida's email containing the revised offer letter (as it had been to the initial offer letter). *See* Dkt. 22 at 7, 18.

Second, in a section titled "Benefits," the offer letter stated:

> **Switchboard Technology Labs, Inc**, through TriNet, offers a full range of benefits for you and your qualified dependents as outlined in the attached Summary of Benefits. A presentation of our benefits program will be given to you during your first week of employment. Information about these benefits is included with this letter, and additional information will be available on-line on the terms and conditions included in the Terms and Conditions Agreement (TCA) each new employee must accept in order to access TriNet's on-line self-service portal, TriNet Passport.

Dkt. 18 at 6 (emphasis in original). In contrast to the Proprietary Information Agreement (and the benefits summary), the TCA was not attached to either the original or revised offer letter. *See* Dkt. 22 at 7, 18. Instead, as quoted above, the offer letter informed Mr. Erhart he would be

presented with the TCA at some later unspecified time, "on-line," when he would have to accept the TCA to use "TriNet's on-line self-service portal." Dkt. 18 at 6.

Third, the letter concluded in relevant part:

> This offer letter, together with the TCA **and your Employee Non-Disclosure and Invention Assignment Agreement**, forms the complete and exclusive agreement as to your employment with **Switchboard Technology Labs, Inc.** . . . If you wish to accept employment at **Switchboard Technology Labs, Inc.** under the terms described above, **please sign and date this letter and the Employee Non-Disclosure and Invention Assignment Agreement and return them to your supervisor at Switchboard Technology Labs, Inc. by 08/25/2021**.

*Id.* at 6–7 (emphasis in original). This conclusion, while purporting to incorporate the TCA into the "complete and exclusive agreement" as to employment, uses bold text and the requirement of separate signatures to focus the employee's attention on the offer letter and the Proprietary Information Agreement, and away from the TCA. Nothing in the letter informs the employee that the TCA—which was not attached to either offer letter, and which the letter represented would be given to the employee online, later, as part of additional information about "benefits"—contains a mandatory arbitration clause. And with respect to Mr. Erhart specifically, Hermida never informed him that the TCA was the same document he called the "TriNet terms" and had attached to a previous email a few days earlier in response to Mr. Erhart's queries about agreements between Switchboard and TriNet.

Mr. Erhart signed the offer letter and NDIAA on August 23, 2021. *See* Dkt. 21 at 7; Dkt. 22 at 20. On August 31, when Mr. Erhart began work, Dkt. 21 at 7, he received an email from TriNet to set up his benefits portal as part of his on-boarding process. *See* Dkt. 22 at 22. The email instructed him that as part of setting up his "profile in TriNet's system," he should "Read the TriNet Terms and Conditions Agreement (TCA), and if you agree to the TCA, then click Accept." *See id*.

The "TriNet Terms and Conditions Agreement (TCA)" states on its first page that it

ORDER DENYING DEFENDANT'S MOTION TO COMPEL ARBITRATION - 4

"contains important information regarding . . . use of the TriNet Platform and online services, and the handling of any disputes arising out of your relationship with TriNet, your company, and related matters." Dkt. 18 at 11. The terms include a section titled "Dispute Resolution Protocol ("DRP") and Mandatory Arbitration of Claims." *Id*. at 15. The section states, "arbitration will be used instead of going before a court . . . for any dispute arising out of or relating to your co-employment with TriNet and/or arising out of or relating to your employment with your company, and for any dispute with an employee, officer, or director of TriNet or of a TriNet customer." *Id*.

Mr. Erhart does not recall accepting the TCA, nor has Switchboard or TriNet presented documentation of acceptance. Dkt. 21 at 8. Instead, Switchboard argues that the TCA was incorporated by reference into Mr. Erhart's offer letter, and that he became bound by the TCA's mandatory arbitration provision when he accepted the offer of employment. Dkt. 17 at 5–6.

### III.    LEGAL STANDARD

#### A.    Federal Arbitration Act

The Federal Arbitration Act ("FAA") makes agreements to arbitrate "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "A party seeking to compel arbitration has the burden under the FAA to show (1) the existence of a valid, written agreement to arbitrate; and, if it exists, (2) that the agreement to arbitrate encompasses the dispute at issue." *Ashbey v. Archstone Prop. Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015). While there is an "emphatic federal policy in favor of arbitral dispute resolution," *KPMG v. Cocchi*, 565 U.S. 18, 21 (2011), the Court must make the threshold determination that a valid contract was formed before ordering arbitration, *see Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 719 (9th Cir. 1999); *Lowden v. T-Mobile USA, Inc.*, 512 F.3d 1213, 1217 (9th Cir. 2008). Courts apply state contract law to determine whether the parties

ORDER DENYING DEFENDANT'S MOTION TO COMPEL ARBITRATION - 5

formed a valid agreement to arbitrate. *Lowden*, 512 F.3d at 1217 (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). Switchboard agrees that Washington contract law governs that question here. Dkt. 17 at 5.

### B.    Washington law on contract formation

In Washington, "[a]rbitration agreements stand on equal footing with other contracts." *Burnett v. Pagliacci Pizza, Inc.*, 196 Wn.2d 38, 47, 470 P.3d 486 (2020). And "mutual assent is required for the formation of a valid contract. It is essential to the formation of a contract that the parties manifest to each other their mutual assent to the same bargain at the same time." *Id.* at 48 (cleaned up).

"This rule applies to the formation of an arbitration agreement just as it does to the formation of any other contract." *Id.* "The first principle that underscores all of our arbitration decisions is that arbitration is strictly a matter of consent," *id.* (quoting *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 184 (2019)), and "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Id.* at 48 (quoting *Satomi Owners Ass'n v. Satoma, LLC*, 167 Wn.2d 781, 810, 225 P.3d 213 (2009)).

Under Washington contract law, "incorporation by reference does not, in itself, establish mutual assent to the terms being incorporated." *Id.* at 49. Instead, "it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms." *Id.* (cleaned up). "Mutual assent is gleaned from outward manifestations and circumstances surrounding the transaction." *Id.* at 50.

### IV.    DISCUSSION

### A.    Switchboard has not shown an agreement to arbitrate.

The Washington Supreme Court decided *Burnett v. Pagliacci Pizza* in August 2020—a year before the events giving rise to this case. *Burnett* is the most recent precedent from

ORDER DENYING DEFENDANT'S MOTION TO COMPEL ARBITRATION - 6

Washington's highest court on the doctrines of mutual assent and incorporation by reference under Washington contract law. Yet when Switchboard filed its motion to compel arbitration in December 2023, relying on the doctrine of incorporation by reference, it failed in either its motion or reply brief to even acknowledge the existence of *Burnett*, let alone address its application to this case. Instead, Switchboard—litigating against a pro se plaintiff—relied entirely on cases decided before *Burnett*. *See* Dkt. 17 at 5–6. This Court scheduled oral argument and directed the parties to address *Burnett*. Dkt. 31. At oral argument, in response to the Court's concerns that Switchboard's motion showed a lack of candor to the tribunal, Switchboard maintained that *Burnett* has no application whatsoever to this case.

These arguments are unpersuasive; to the contrary, *Burnett* controls the outcome of Switchboard's attempt to compel arbitration. In *Burnett*, the plaintiff, a pizza delivery driver, attended a mandatory new employee orientation at the outset of his employment. 196 Wn.2d at 42–43. To begin working, Burnett was required to sign an "Employee Relationship Agreement," referred to in the opinion as "the ERA." *Id.* at 43. The ERA did not mention arbitration. *Id.* Instead, in a section entitled "Rules and Policies," the ERA referred to a separate document called the "Little Book of Answers." *Id.* Although Pagliacci gave Burnett a copy of the Little Book of Answers at the orientation, he was "told to read it at home," and the ERA similarly instructed: "On your own initiative you will learn and comply with the rules and policies outlined in our Little Book of Answers." *Id.* The Little Book of Answers contained a mandatory arbitration policy, which Pagliacci argued had been incorporated by reference into Burnett's signed Employee Relationship Agreement. *See id.* at 44–46. The trial court disagreed, ruling that the arbitration provision was not incorporated by reference. *Id.* at 45. The Washington Court of Appeals overturned that ruling (agreeing instead with Pagliacci that there was an agreement to arbitrate) but invalidated the agreement on the grounds of unconscionability. *Id.* at 46.

ORDER DENYING DEFENDANT'S MOTION TO COMPEL ARBITRATION - 7

After granting Pagliacci's petition for review, the Washington Supreme Court ruled for Burnett on both grounds, affirming the Court of Appeals that the arbitration agreement was unconscionable but also holding, "as a threshold matter," that Burnett never assented to the mandatory arbitration provision because he had no notice of it when he signed his employment contract. *Id.* at 47. The Washington Supreme Court explained that even if "the mention of the handbook in the ERA effectively incorporates the handbook by reference into the ERA, that does not mean there was an effective arbitration *agreement* between Burnett and Pagliacci." *Id.* at 49. "While the arbitration provision existed in the handbook when Burnett signed the ERA, Burnett still had no knowledge of it as he was expected to read the handbook later, on his own time." *Id.* Because Burnett did not have "a reasonable opportunity to understand the terms contained in the Little Book—and specifically the mandatory arbitration policy—before he signed the ERA," he "lacked knowledge of the incorporated terms," and therefore "never assented" to the mandatory arbitration policy. *Id.* at 50.

There is no meaningful distinction between *Burnett* and this case. Switchboard contends in its motion to compel arbitration that its offer letter to Mr. Erhart "clearly and unequivocally" "incorporates the TCA in full, including its arbitration provision." Dkt. 17 at 5–6. But as *Burnett* holds, that is not enough to show an "effective arbitration agreement," because "it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms." 196 Wn.2d at 49 (cleaned up). Here, just as in *Burnett*, nothing in the offer letter mentioned arbitration or gave any indication to Mr. Erhart that the TCA contained a mandatory arbitration provision. *See* Dkt. 18 at 5–7. Instead, the offer letter told Mr. Erhart that he would read the TCA later, after signing the contract, as part of "additional information" about "benefits." Dkt. 18 at 6.

At oral argument, counsel for Switchboard argued that *Burnett* is distinguishable because here, Mr. Erhart happened to receive a copy of the TCA a few days before the offer letter (when

he had asked Hermida for a different contract outlining Switchboard's PEO relationship with TriNet); therefore, Switchboard maintains, he had a reasonable opportunity to understand its terms before signing. Switchboard's argument is essentially that because Mr. Erhart is a software engineer rather than a pizza delivery driver, he should have been able to piece together that the document Hermida emailed to him days earlier as "TriNet's Terms"—in response to Mr. Erhart's separate inquiry about agreements between Switchboard and TriNet—was in fact the TCA referenced in the offer letter, and he should have known to read it before signing, despite Switchboard telling him the TCA was something he would receive later in connection with the online benefits portal.

This is a distinction without a difference. If anything, Switchboard's actions demonstrate more affirmative misdirection than those of Pagliacci Pizza. In *Burnett*, the employer gave the "Little Book of Answers" to Burnett at the same orientation where it required him to sign the employment agreement. 196 Wn.2d at 43. But because he was told to read it later after signing, and nothing in the employment agreement itself alerted him to the presence of the arbitration policy, the Court concluded that Pagliacci could not show Burnett had knowledge of and assented to its terms. *See id.* at 47–50. Here, Switchboard did not even provide the offer letter and the TCA to Mr. Erhart at the same time. The offer letter mentioned the TCA in a section on "benefits," not the section discussing "rules and regulations"; it told Mr. Erhart he would receive the TCA later when accessing the benefits portal; and it used bold typeface to emphasize other aspects of the employment agreement and draw attention away from the TCA. *See* Dkt. 18 at 5–7. It is not reasonable to expect Mr. Erhart to have understood from that letter that it was incorporating a document sent days earlier, with a different name, in response to an unrelated question, with no description of its relevance to his employment with Switchboard. Like Mr. Burnett, Mr. Erhart did not have "a reasonable opportunity to understand the terms

contained" in the TCA—"and specifically the mandatory arbitration policy"—before he signed the offer letter. *Burnett*, 196 Wn.2d at 50. He therefore "lacked knowledge of the incorporated terms" and "never assented" to the mandatory arbitration provision. *Id.* Without "mutual assent to the same bargain at the same time," Switchboard and Mr. Erhart did not form a valid agreement to arbitrate under Washington law. *Id.* at 48.

## V. CONCLUSION

Because the Court concludes that a valid agreement to arbitrate does not exist, it need not address the parties' other arguments such as unconscionability or whether "the agreement encompasses the dispute at issue." *Lowden*, 512 F.3d at 1217. Switchboard's motion to compel arbitration is DENIED.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing pro se at said party's last known address.

Dated this 25th day of March, 2024.

Tiffany M. Cartwright
United States District Judge